**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **MALCOLM JOHNSON, STEPHANIE KAISER, JESSIE CLARK, CHRISTINA CARMICHAEL, TARA JOHNSON, KATHLEEN SANDERS, DR. F, TRAVIS BRENNEMAN, MS. D, LINDA RISER, CHAD DILLARD, HEIDI HOPKINS, GLENN HOPKINS, LEANN WAGERLE, TERESA LYNN KARN, BOAZ MILLER, CANDY BARNETT, LANE EWRY, MARGARET HENSON, MELISSA SWANCUTT, MS. B, WENDY SUMNER, ADRIAN PARK, DR. C, KIMBERLY SWEGAR, KELLY HICKMAN, MS. E, GAIL GILTNER, MS. G, JENNIFER BRIER, MELANIE CRITES-BACHERT, D.O., MARTI LAMB, MARY GABRIELE, M.D., ELISABETH COATES, KORI DISTEFANO, TERESE LAMPA, JAZMIN GRAFF, M.D., TERRI KAM, STEPHANIE NYHUS, DR. A, DAVID WEST, NATE LYONS, JANE/JOHN DOES 1-100**, | Case No. 3:21-cv-1494-SI  **OPINION AND ORDER** |

Plaintiffs,

v.

**KATE BROWN**, in her official capacity of Governor of the State of Oregon; **PATRICK ALLEN**, in his official capacity as Director of the Oregon Health Authority,

Defendants.

Stephen J. Joncus, JONCUS LAW P.C., 13203 SE 172nd Avenue, Suite 166 #344, Happy Valley, OR 97086. Of Attorneys for Plaintiffs.

Ellen F. Rosenblum, Attorney General; Marc Abrams, Assistant Attorney-in-Charge; and Christina L. Beatty-Walters, Senior Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

This case presents another instance of individuals seeking to avoid the obligations imposed by a state-ordered COVID-19 vaccination mandate intended to protect the health of the community during a global pandemic. Under an executive order and related regulations, Oregon requires certain employees, not exempt on either medical or religious grounds, to be vaccinated against COVID-19 or face the risk of losing their jobs. Attempting to avoid the well-established constitutional framework for evaluating such a requirement, Plaintiffs invoke the international law doctrine of *jus cogens* (compelling law or peremptory norm). Plaintiffs, however, fail to show that they satisfy the prerequisites for this powerful, international legal principle, as determined under United States law. Because the applicable constitutional test asks only whether a state has shown a rational basis for its decision and the action challenged here satisfies that test, the Court denies Plaintiffs' motion for a temporary restraining order (TRO).

Plaintiffs are 42 individuals who are healthcare providers, healthcare staff, teachers, school staff, a school volunteer, and a State agency employee. They allege that they are subject to orders issued by Oregon Governor Kate Brown and the Oregon Health Authority (OHA) requiring educational and health workers and certain executive State employees be vaccinated against COVID-19 (Vaccine Orders). For most persons covered by the Vaccine Orders, they must show both an intent to get fully vaccinated and forward progress, specifically by getting at least one dose of the vaccine, by October 18, 2021, or they must apply for or obtain an exception

before that date.[1] Otherwise, they face the risk of having their employers terminate their employment. Plaintiffs sue Oregon Governor Kate Brown, in her official capacity, and Patrick Allen, in his official capacity as Director of the OHA. Plaintiffs assert four claims for relief.[2] Two claims invoke 42 U.S.C. § 1983, alleging that Defendants violated Plaintiffs' rights under the Due Process Clause and the Privileges or Immunities Clause of the Fourteenth Amendment of the U.S. Constitution by coercing persons into taking what Plaintiffs allege is "experimental" medication: the Pfizer-BioNTech COVID-19 vaccine. Plaintiffs' third claim invokes the Supremacy Clause of the Constitution, alleging that a federal statute relating to emergency use authorizations for vaccines requires informed consent and the Vaccine Orders conflict with that law and are therefore unconstitutional. Plaintiffs' final claim is that Defendants violated Oregon Revised Statutes (ORS) § 431.180. Plaintiffs allege that the Vaccine Orders coerce Plaintiffs into taking experimental medication and thus interfere with Plaintiffs' choice of treatment for COVID-19, in violation of ORS § 431.180.

Before the Court is Plaintiffs' motion for a TRO. Plaintiffs argue that because their constitutional rights have been violated and they are in danger of losing their jobs, they face imminent irreparable harm. Plaintiffs also argue that because their right not to be coerced to take

---

[1] Some persons covered by the Vaccine Orders must be fully vaccinated before October 18, 2021 or apply for or obtain an exception.

[2] Plaintiffs' purported fifth claim for relief, labeled "Injunction," is a remedy and not an independent cause of action. *See Harney v. Assoc. Materials, LLC*, 2018 WL 468303, at *8 (D. Or. Jan. 18, 2018) ("The Court agrees, however, that Plaintiffs' requests for declaratory and injunctive relief are remedies for the Court to determine, and not independent claims. They should be pleaded as such in any future amended pleading."); *see also Yaak Valley Forest Council v. Vilsack*, 2021 WL 4438420, at *8 (D. Mont. Sept. 28, 2021) ("The Forest Service is correct that, insofar as Yaak Valley presents its request for an injunction as a 'claim' for relief, it is mistaken."); *Cox Commc'ns PCS v. City of San Marcos*, 204 F. Supp. 2d 1272, 1283 (S.D. Cal. 2002) ("Injunctive relief, like damages, is a remedy requested by the parties, not a separate cause of action.").

experimental medication is "undeniable," they are likely to succeed on the merits of their claims, and that the balance of the equities and public interest factors tip in their favor.

## STANDARDS

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, rather than its likelihood, was sometimes sufficient to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

In addition, a TRO is necessarily of a shorter and more limited duration than a preliminary injunction.[3] Thus, the application of the relevant factors may differ, depending on whether the court is considering a TRO or a preliminary injunction.[4] Indeed, the two factors most likely to be affected by whether the motion at issue is for a TRO or a preliminary injunction are the balancing of the equities among the parties and the public interest. Finally, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc*., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND[5]

For nearly two years, COVID-19 has presented a serious risk to the health and safety of our community, nation, and world. The COVID-19 infection, caused by the virus SARS-CoV-2, undergoes mutations as it replicates, resulting in variants, some of which are more severe and

---

[3] The duration of a TRO issued *without* notice may not exceed 14 days but may be extended by a court once for an additional 14 days for good cause, provided that the reasons for the extension are entered in the record. Fed. R. Civ. P. 65(b)(2). When a TRO is issued with notice and after a hearing, however, the 14-day limit for TROs issued without notice does not apply. *See Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 n.1 (D. Or. 2016), citing *Horn Abbot Ltd. v. Sarsaparilla Ltd*., 601 F. Supp. 360, 368 n.12 (N.D. Ill. 1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id*. Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a TRO.

[4] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses towards its conclusion. *See Pac. Kidney*, 156 F. Supp. 3d at 1222 n.2.

[5] The Court finds the facts stated below by a preponderance of the evidence.

transmissible than earlier variants. This case mainly concerns the authorization and approval by the United States Food and Drug Administration (FDA) of Pfizer-BioNTech's vaccine against COVID-19, and its interplay with the Vaccine Orders issued by Governor Brown and the OHA in response to dramatically increasing COVID-19 infections and hospitalizations in Oregon, particularly among the unvaccinated, to help respond to the public health crisis.

## A. Pfizer-BioNTech Vaccine

### 1. Early Vaccine Development and Authorizations

In response to the global pandemic, Pfizer and BioNTech,[6] along with other pharmaceutical companies, began working on a COVID-19 vaccine. To that end, Pfizer-BioNTech developed a vaccine that uses messenger RNA (mRNA), and began conducting clinical trials on the vaccine in April 2020. *See* ECF 3-1 at 3-4 (describing the background of the clinical trials of the Pfizer-BioNTech Vaccine); ECF 3-4 at 24 (same); ECF 10-1, 10-2 (clinical trials data).[7] This included a clinical trial with approximately 44,000 participants. ECF 3-1 at 3; ECF 10-4 at 3; ECF 3-4 at 24; ECF 10-1.

On December 11, 2020, Pfizer-BioNTech received its first Emergency Use Authorization (EUA) from the FDA for its vaccine (Pfizer-BioNTech Vaccine or Pfizer-BioNTech COVID-19 Vaccine). ECF 3-1 at 1, 3 (describing the history of the EUAs for the Pfizer-BioNTech Vaccine); ECF 10-4 at 3 (same). This EUA authorized the Pfizer-BioNTech Vaccine as a two-dose

---

[6] Some of the documentation in the record is addressed to BioNTech, some to Pfizer, and there is some indication that BioNTech focused on vaccine development and Pfizer on vaccine marketing and distribution. For purposes of this Opinion and Order, unless specifically stated, the Court treats Pfizer and BioNTech as a single entity, "Pfizer-BioNTech," related to the vaccine.

[7] Before the October 15, 2021 hearing, the Court notified the parties that it intended to take judicial notice of these public records under Rule 201(c) of the Federal Rules of Evidence. No party objected.

treatment for individuals 16 years and older. *Id.* The EUA relied, in part, on the clinical trial of

approximately 44,000 participants, among other clinical trials. EC 3-1 at; ECF 10-4 at; ECF 3-4

at 24.

On December 21, 2020, Pfizer-BioNTech received conditional marketing authorization in

the European Union (EU) for its COVID-19 vaccine.[8] The European Medicines Agency

recommended that the European Commission grant the conditional approval in part based on the

data from the ongoing clinical trial of 44,000 participants on which the FDA also relied in

granting the EUA on December 11, 2020.[9] On that date, BioNTech explained that its "vaccine

will be marketed in the EU under the brand name COMIRNATY®."[10] BioNTech also stated:

"With this EU authorization in all 27 EU member states, the COVID-19 vaccine has now been

granted a conditional marketing authorization, emergency use authorization, or a temporary

authorization in a total of more than 40 countries. Regulatory reviews are underway in several

---

[8] The Court takes judicial notice under Rule 201(b) and (c) of the Federal Rules of Evidence of the publicly available facts regarding the conditional marketing authorization for COMIRNATY® in the European Union from the public records of the European Medicines Agency (EMA) (*see* Rule 803(8) of the Federal Rules of Evidence) and the December 21, 2020, contemporaneous press release issued by BioNTech (Rule 803(6)). *See Comirnaty, Authorisation Details*, European Medicines Agency, https://www.ema.europa.eu/en/medicines/human/EPAR/comirnaty (last updated October 15, 2021); *EMA Recommends First COVID-19 Vaccine for Authorization in the EU*, European Medicines Agency (Dec. 21, 2020), https://www.ema.europa.eu/en/news/ema-recommends-first-covid-19-vaccine-authorisation-eu (EMA Statement); *see also* Press Release, BioNTech, *Pfizer and BioNTech Receive Authorization in European Union for COVID-19 Vaccine* (Dec. 21, 2020), https://investors.biontech.de/news-releases/news-release-details/pfizer-and-biontech-receive-authorization-european-union-covid (Dec. 2020 BioNTech Press Release).

[9] EMA Statement, *supra*.

[10] Pfizer-BioNTech explained that COMIRNATY® "represents a combination of the terms COVID-19, mRNA, community, and immunity." Dec. 2020 BioNTech Press Release, *supra*.

countries, with more authorizations anticipated in the coming weeks."[11] BioNTech continued, explaining that its vaccine had only an EUA from the FDA.[12] The press release described Pfizer's and BioNTech's forward-looking plans for the development of the vaccine and plans for the vaccine's marketing and distribution throughout the world. BioNTech also explained that "COMIRNATY®" is "also known as BNT162b2," which is BioNTech's vaccine's identifier in the clinical trials.[13] Throughout the press release, BioNTech referred only to "the" vaccine in the singular and referred interchangeably to its vaccine as "COMIRNATY®," "BNT162b2," and "Pfizer-BioNTech COVID-19 Vaccine."[14] Based on these facts, the Court finds that in December 2020 the same vaccine was given conditional marketing approval in the EU as COMIRNATY® as was given an EUA in the United States as Pfizer-BioNTech COVID-19 Vaccine, and Pfizer-BioNTech expected that same vaccine would continue to get further approvals and authorizations.

### 2.    FDA License Approval and Continuing Emergency Use Authorizations

The FDA reissued the EUA for the Pfizer-BioNTech Vaccine on December 23, 2020, February 25, 2021, May 10, 2021, June 25, 2021, and August 12, 2021. ECF 3-1 at 1-2. On May 18, 2021, BioNTech[15] submitted a Biologics License Application (BLA) for approval of its mRNA vaccine. *See* ECF 10-3 at 1 (noting when BioNTech submitted the BLA). On August 23,

---

[11] Dec. 2020 BioNTech Press Release, *supra*.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] In the Pfizer-BioNTech partnership, BioNTech will "hold the regulatory authorization in the U.S., U.K., Canada, EU, and, if authorized, in other countries. Pfizer will have marketing and distribution rights worldwide with the exception of China, Germany, and Turkey." *Id.*

2021, the FDA approved the BLA for the Pfizer-BioNTech mRNA COVID-19 vaccine (the August FDA Approval). *Id.* Under that license, BioNTech is "authorized to manufacture the product, COVID-19 Vaccine, mRNA, which is indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older." *Id.* The August FDA Approval also provided that BioNTech "may label [the] product with the proprietary name, COMIRNATY," with approved labeling. *Id.* at 2. This approval was based, in part, on the same clinical trial with approximately 44,000 participants as the EUA authorizations and the EU conditional marketing approval. *See id.* at 1; ECF 10-1.

Also on August 23, 2021, the FDA reissued the EUA for the Pfizer-BioNTech COVID-19 Vaccine. ECF 3-1 at 2 (August 23 EUA). The August 23 EUA "clarif[ied] that the EUA will remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses, and to authorize use of COMIRNATY® (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved BLA." *Id.* The August 23 EUA also clarified that COMIRNATY® "is the same formulation as the Pfizer-BioNTech COVID-19 Vaccine and can be used interchangeably . . . to provide the COVID-19 vaccination series." *Id.* In a footnote, the FDA further explained that:

> The licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

*Id.* at 2 n.8. The August 23 EUA permitted the use of the Pfizer-BioNTech COVID-19 Vaccine "to prevent COVID-19 in individuals ages 12 and older" and permitted a third dose for "individuals 12 years of age or older," who are considered medically higher-risk. *Id.* at 6-7.

The FDA explained in the August 23 EUA why it was continuing to provide emergency use of the Pfizer-BioNTech Vaccine instead of only allowing the identically formulated COMIRNATY® going forward. The FDA determined that at the time of the August FDA Approval there was insufficient branded COMIRNATY® product to vaccinate the population of persons over 16 years old. *Id.* at 5 n.9. Further, there were "no products that are approved to prevent COVID-19 in individuals age 12 through 15, or that are approved to provide an additional dose to the immunocompromised population described in [the August 23] EUA." *Id.* The FDA further explained:

> COMIRNATY (COVID-19 Vaccine, mRNA) is now licensed for individuals 16 years of age and older. There remains, however, a significant amount of Pfizer-BioNTech COVID-19 vaccine that was manufactured and labeled in accordance with this emergency use authorization. This authorization thus remains in place with respect to that product for the previously-authorized indication and uses (i.e., for use to prevent COVID-19 in individuals 12 years of age and older with a two-dose regimen, and to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise).

*Id.* at 12. Thus, the FDA stated that it continued its EUA for the Pfizer-BioNTech Vaccine after approving COMIRNATY® because there was a backlog of labeled and branded Pfizer-BioNTech Vaccine, there was not enough branded and labeled COMIRNATY® vaccine, the two vaccines have the same formulations and can be used interchangeably, and there are some uses for which COMIRNATY® was not approved.[16]

---

[16] Plaintiffs' counsel argued at the hearing that one reason the EUA for the Pfizer-BioNTech vaccine was reissued was so that Pfizer and BioNTech could be immunized from legal liability for the harm caused by the vaccine. Plaintiffs, however, did not provide any specific factual or legal authority for this assertion of legal immunity, only generally referencing "the EUA statute and the CARES Act." In various sections of this Opinion and Order, the Court assumes *arguendo* and without deciding that Plaintiffs' assertions about legal liability are accurate.

Based on the current record, the Court finds that the August FDA Approval of Pfizer-BioNTech's mRNA vaccine was for the chemically and biologically identical vaccine that underwent clinical trials, was given conditional marketing approval in the EU in December 2020 under the brand name COMIRNATY®, and was given EUA by the FDA in the United States under the name "Pfizer-BioNTech COVID-19 Vaccine" beginning in December 2020.[17] As the Centers for Disease Control and Prevention (CDC) explains, it was the same Pfizer-BioNTech vaccine that after the August FDA Approval could also be labeled and branded in the United States by its brand name, COMIRNATY®:

> Pfizer-BioNTech (COMIRNATY®) received U.S. Food and Drug Administration (FDA) approval on August 23, 2021, for individuals 16 years of age and older. Once vaccines are approved by the FDA, companies can market the vaccines under brand names. COMIRNATY® is the brand name for the Pfizer-BioNTech COVID-19 Vaccine. Now that the FDA-authorized Pfizer-BioNTech COVID-19 vaccine has been approved by the FDA for individuals 16 years of age and older, it will be marketed as COMIRNATY®. The use of the name Pfizer-BioNTech will

---

[17] After the TRO hearing concluded but before the Court issued this Opinion and Order, Plaintiffs filed "Plaintiffs' Notice of Supplemental Authority." ECF 16. The Court notes that this is not a "legal" authority, supplemental or otherwise. Instead, it is appears to be additional "scientific evidence." Although Plaintiffs' new submission would appear to be admissible as a public record from the FDA, *see* Fed. R. Evid. 803(8), it is highly technical and, as Plaintiffs acknowledge, appears to require some "speculation" to interpret. The Court further notes that because of Plaintiffs' late filing, Defendants have not had a chance to respond to this added evidence. Even so, the Court will receive Plaintiffs' additional evidence but concludes that, at least without further foundation and explanation, it carries little weight. The Court reaches this conclusion because the repeat dose toxicity studies were conducted before December 2020, and thus the fact that one study involved one version of the vaccine (BNT162b2(V8)) and another study involved the clinically relevant version (BNT162b2(V9)), is neither instructive nor helpful. What is instructive, however, is that the clinically relevant version, BNT162b2(V9), was approved by the EU as COMIRNATY in December 2020. *See, e.g.*, Antonio F. Hernandez, *et al*., *Safety of COVID-19 Vaccines Administered in the EU: Should We Be Concerned?*, 8 TOXICOLOGY REP., 871, 871-72 (April 2021) (explaining that the EMA approved COMIRNATY in December 2020 and that the EMA's assessment report describes the "pivotal (preclinical) . . . repeat-dose toxicity studies, one with 30 µg of the clinically relevant variant and other with 100 µg of another variant" and that the studies analyzed "variant 8" and "clinically relevant variant 9"). The parties may further develop this technical point in future proceedings in this case.

> still be used for individuals 12-15 years old since this age group
> has not been approved. There has **been no change** in the
> formulation of the vaccine since the name change.

*Pfizer-BioNTech COVID-19 Vaccine Overview and Safety (also known as COMIRNATY®)*,

CTRS FOR DISEASE CONTROL & PREVENTION (Sept. 28, 2021), https://www.cdc.gov/coronavirus/

2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (incorporated by reference in

ECF 14, ¶ 13) (emphasis in original). The FDA also explained this fact in its press release

announcing the vaccine's approval: "Today the U.S. Food and Drug Administration approved the

first COVID-19 vaccine. The vaccine has been known as the Pfizer-BioNTech COVID-19

Vaccine, and will now be marketed as Comirnaty." Press Release, U.S. Food & Drug Admin.,

*FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021), https://www.fda.gov/news-

events/press-announcements/fda-approves-first-covid-19-vaccine.

The approved use of COMIRNATY®, however, is limited to only two doses and to

persons who are age 16 or older. Thus, the August 23 EUA "also covers the use of the licensed

COMIRNATY . . . when used to provide a two-dose regimen for individuals aged 12 through 15

years, or to provide a third dose to individuals 12 years of age or older who" are considered

medically higher-risk. *Id.* This provision allows COMIRNATY®, under the EUA, to be used in

those circumstances for which it was not approved under its license but for which the EUA

authorizes vaccination. The August 23 EUA, therefore, applies both to COMIRNATY® and to

the Pfizer-BioNTech Vaccine.

The FDA issued another EUA on September 22, 2021 (September 22 EUA), in which it

> reissue[ed] the August 23, 2021 letter of authorization in its
> entirety with revisions incorporated to authorize for emergency use
> the administration of a single booster dose of COMIRNATY . . . or
> Pfizer-BioNTech COVID-19 Vaccine at least 6 months after
> completing the primary series of this vaccine in individuals: 65
> years of age or older; 18 through 64 years of age at high risk of
> severe COVID-19; and 18 through 64 years of age whose frequent

> institutional or occupational exposure to SARS-CoV-2 puts them
> at high risk for serious complications of COVID-19 including
> severe COVID-19.

ECF 10-4 at 2. The FDA clarified that,

> subsequent to the FDA approval of COMIRNATY . . . for the
> prevention of COVID-19 in individuals 16 years of age and older,
> this EUA would remain in place for the Pfizer-BioNTech COVID-
> 19 vaccine for the previously-authorized indication and uses. It
> also authorized COMIRNATY® . . . under this EUA for certain
> uses that are not included in the approved biologics license
> application (BLA).

*Id.* at 2 n.9. The September 22 EUA reiterates the same provisions about COMIRNATY® and

the Pfizer-BioNTech vaccines being the same formulation and interchangeable, and that the

EUA is continued because of excess Pfizer-BioNTech product, lack of COMIRNATY® product,

and the off-label use need (ages 12-15 and the third booster shot).[18]

The September 22 EUA, then, merely changed the eligibility criteria for receiving a third

dose of the vaccine from individuals ages 12 and older with certain medical conditions to

individuals ages 18 and older with certain higher-risk circumstances, including, but not limited

to, medical conditions. This regimen is explained in a document entitled "Vaccine Information

Fact Sheet for Recipients and Caregivers about COMIRNATY . . . and Pfizer-BioNTech . . . to

Prevent Coronavirus Disease 2019 (COVID-19)." ECF 3-3 at 1.

The Fact Sheet that describes the regimen also emphasizes that the approved and

authorized vaccines are interchangeable:

> Pfizer-BioNTech COVID-19 Vaccine contains a nucleoside-
> modified messenger RNA (modRNA) encoding the viral spike (S)
> glycoprotein of SARS-CoV-2 formulated in lipid particles.

---

[18] At the hearing counsel for Plaintiffs argued that there may be more than just legal
differences between COMIRNATY® and the Pfizer-BioNTech Vaccine, but Plaintiffs did not
cite any factual basis for that assertion. In the absence of such evidence, the Court rejects
Plaintiffs' contention.

> COMIRNATY (COVID-19 Vaccine, mRNA) is the same
> formulation as the Pfizer-BioNTech COVID-19 Vaccine and can
> be used interchangeably with the Pfizer-BioNTech COVID-19
> Vaccine to provide the COVID-19 vaccination series.

*Id.*; *see also FDA Fact Sheet for Healthcare Providers Administering Vaccine . . . The Pfizer-*

*BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019* (COVID-19), ECF 3-4 at 1

("The FDA-approved COMIRNATY (COVID-19 Vaccine, mRNA) and the EUA-authorized

Pfizer-BioNTech COVID-19 Vaccine have the same formulation and can be used

interchangeably to provide the COVID-19 vaccination series.").

In sum, as of September 22, 2021, the FDA had given full approval to COMIRNATY®

for use in individuals ages 16 and older for a two-shot series, an EUA for Pfizer-BioNTech

Vaccine in individuals ages 12 and older and as a third booster shot for certain individuals over

the age of 18, and an EUA for COMIRNATY® for certain uses not covered in the August FDA

Approval so its use is co-extensive to the Pfizer-BioNTech Vaccine. The FDA and CDC also has

repeatedly emphasized, including in instructions to healthcare providers administering the

vaccine, that COMIRNATY® and the Pfizer-BioNTech Vaccine have the *same formulation* and

can be used interchangeably.

**B.  Summer 2021 COVID-19 Surge in Oregon**

By June 2021, it appeared as though COVID-19 was waning, with only 138 cases

reported on June 25, 2021. *Oregon COVID-19 Case and Testing Counts Statewide*, OR.

HEALTH AUTH., https://public.tableau.com/app/profile/oregon.health.authority.covid.19/viz/

OregonHealthAuthorityCOVID-19DataDashboard/COVID-19EPICases (incorporated by

reference in ECF 14, ¶¶ 9-10) (OHA Case Dashboard). With the Delta variant, however, cases

began rising again. The Delta variant is much more transmissible (an average infected person

would transmit to 2-3 people, with Delta that number is 5 people), with evidence of increased

severity and reduced effectiveness of treatments and vaccines. ECF 14, ¶¶ 6-7. The Delta variant

became (and continues to be) the dominant strain in Oregon. *Id.*, ¶¶ 8, 15; *see also* OHA Case

Dashboard, *supra*.

On both July 27th and 28th, more than 1,100 new cases were reported in Oregon. OHA

Case Dashboard, *supra*. On August 9, 2021, reported new cases soared to more than 2,000,

reaching a high of 2,611 on August 16th. *Id.* Because of this summer surge in cases,

hospitalizations in Oregon due to COVID-19 reached their highest level of the entire pandemic

on September 1, 2021, with 1,178 individuals hospitalized with COVID-19. ECF 14, ¶ 10

(incorporating by reference *Oregon's Hospitalization Trends by Severity*, OR. HEALTH AUTH.,

https://public.tableau.com/app/profile/oregon.health.authority.covid.19/viz/OregonCOVID-19Ho

spitalCapacity/HospitalizationbySeverity (OHA Hospitalization Dashboard)). This was more

than double the previous high of 584 hospitalizations on November 30, 2020. *Id.* On

September 28, 2021, there were 1,533 new reported COVID-19 cases, and 822 persons

hospitalized with the virus. OHA Case Dashboard, *supra*; OHA Hospitalization Dashboard,

*supra*.

Caring for such a large number of COVID-19 patients "strained the ability of hospitals to

provide care for everyone, forcing most to postpone nonurgent care, and leaving many people in

Oregon suffering as they wait for non-urgent procedures such as cancer surgeries, heart

procedures and hip transplants." ECF 14, ¶ 10. The most effective tool against hospitalization

and serious illness from COVID-19 is vaccination.[19]

---

[19] Counsel for Plaintiffs argued at the hearing that the harm from COVID-19 is greater
for vaccinated persons than unvaccinated persons, but Plaintiffs did not submit evidence in the
record supporting this contention.

PAGE 15 – OPINION AND ORDER

Studies and data show that the vaccines are effective in preventing hospitalization. One study has shown vaccines were 87% effective in preventing hospitalization in veterans. ECF 14, ¶ 15. Other data shows that the vaccines are 95% effective in preventing hospitalizations in persons between ages 16-64, and 80% effective in preventing hospitalization in persons older than 65. *Id.* In Oregon, during the week of October 3-9, 2021, of all new reported cases, 72.8% were unvaccinated persons and 27.2% were vaccinated. *Id.*, ¶ 16. Overall in Oregon, there have been 1,365 vaccinated persons that have been hospitalized and 292 who have died. *Id.* This is out of a total of 18,758 hospitalizations and 4,161 deaths. OHA Case Dashboard, *supra*.

The increases in cases and hospitalizations are mostly due to the unvaccinated. ECF 14, ¶¶ 16-17. Defendants' expert, Dr. Melissa Sutton, explains how the data in Oregon shows that the rate of cases in unvaccinated persons is 3.5 times the rate in vaccinated persons. She also describes the inverse relationship between vaccination rates and COVID-19 cases in Oregon counties—those counties with a higher percentage of vaccinated persons have a lower rate of COVID-19 cases and those counties with a lower percentage of vaccinated persons have a higher rate of cases. *Id.*, ¶ 17 She further explains that "hospitalizations and deaths soared among those not fully vaccinated, individuals who were fully vaccinated made up only a small percentage of hospitalizations and deaths during the current surge of cases in Oregon." *Id.*, ¶ 16.

## C.  Vaccine Orders

Before the August FDA Approval of COMIRNATY®, amid the surge in COVID-19 cases across the state, Governor Brown issued Executive Order 21-29 (the EO) on August 13, 2021. ECF 3-2 at 6. The Governor described that the summer surge in COVID-19 infections "is imperiling the state health system's ability to manage not just COVID-19 patients, but also those who require specialized medical care after car accidents, heart attacks, and other medical emergencies" and explained that "employer vaccination requirements have become an important

tool" for managing the surge. *Id.* at 1-2. The Governor also explained that, "[a]s the leader of the executive branch of the state government, [she has] a responsibility to do everything [she] can to protect state workers, their coworkers, and the public that relies on state services." *Id.* at 2. Based on those concerns, the EO requires that state Executive-branch employees be "Fully Vaccinated"[20] against COVID-19 by the later of October 18, 2021, or six weeks after the date that the FDA approves a COVID-19 vaccine.[21] *Id.* at 4. The EO allows for exceptions "for individuals unable to be vaccinated due to disability, qualifying medical condition, or a sincerely held religious belief." *Id.* at 5. The EO remains in effect until terminated by the Governor. *Id.* at 6.

After the August FDA Approval of COMIRNATY®, the OHA adopted temporary rules containing similar vaccine orders. As relevant here, the OHA adopted two rules, ultimately promulgated as Oregon Administrative Rule (OAR) 333-019-1030 (the Education Order) and OAR 333-019-1010 (the Healthcare Order). The Education Order was adopted on August 25, 2021, and is effective through February 20, 2022. OAR 333-019-1030. It describes that "children are required to attend school, which is a congregate setting where COVID-19 can spread easily if precautions are not taken . . . This rule is necessary to help control COVID-19, and to protect students, teachers, school staff, and volunteers." OAR 333-019-1030(1). The Education Order then provides that, after October 18, 2021, "[t]eachers, school staff, and volunteers may not

---

[20] The EO defines "Fully Vaccinated" as "having received both doses of a two-dose COVID-19 vaccine or one dose of a single-dose COVID-19 vaccine and at least 14 days have passed since the individual's final dose of COVID-19 vaccine."

[21] Because six weeks from COMIRNATY®'s August 23, 2021 approval date was October 4, 2021, the October 18, 2021 deadline set out in the EO is the later of the two and is, therefore, the operative deadline.

teach, work, learn, study, assist, observe, or volunteer at a school unless they are fully vaccinated

or have provided documentation of a medical or religious exception." OAR 333-019-1030(3)(a).

The Healthcare Order was originally adopted on August 25, 2021, modified on

September 1, 2021, and is effective through January 31, 2022. OAR 333-019-1010. The

Healthcare Order explains that:

> Healthcare providers and healthcare staff have contact with
> multiple patients over the course of a typical day and week,
> including providers that provide care for people in their homes.
> Individuals cared for in these settings are more likely than the
> general public to have conditions that put them at risk for
> complications due to COVID-19. COVID-19 variants are running
> through the state's unvaccinated population and causing an
> increase in breakthrough cases for those who are fully vaccinated.
> This rule is necessary to help control COVID-19, protect patients,
> and to protect the state's healthcare workforce.

OAR 333-019-1010(1). Based on these concerns, the Healthcare Order provides that after

October 18, 2021, "[a] health care provider or healthcare staff person may not work, learn, study,

assist, observe, or volunteer in a healthcare setting unless they are fully vaccinated or have

provided documentation of a medical or religious exception." OAR 333-019-1010(3)(a).[22]

---

[22] The terms "healthcare providers and healthcare staff" are defined as:

> individuals, paid and unpaid, working, learning, studying, assisting, observing or
> volunteering in a healthcare setting providing direct patient or resident care or who have
> the potential for direct or indirect exposure to patients, residents, or infectious materials,
> and includes but is not limited to any individual licensed by a health regulatory board as
> that is defined in ORS 676.160, unlicensed caregivers, and any clerical, dietary,
> environmental services, laundry, security, engineering and facilities management,
> administrative, billing, student and volunteer personnel.

OAR 333-019-1010(2)(d)(A). "Healthcare setting" is defined as:

> any place where health care, including physical or behavioral health care is delivered and
> includes, but is not limited to any health care facility or agency licensed under ORS
> chapter 441 or 443, such as hospitals, ambulatory surgical centers, birthing centers,
> special inpatient care facilities, long-term acute care facilities, inpatient rehabilitation
> facilities, inpatient hospice facilities, nursing facilities, assisted living facilities,

### D.  Plaintiffs

There are 42 Plaintiffs named in the caption of the Complaint, plus catch-all "Jane/John Does." The allegations in the Complaint, however, relate to only 39 of the Named Plaintiffs and the Jane/John Does. There are no allegations in the Complaint relating to Dr. A, Nate Lyons or David West. Nor did these three Plaintiffs submit a declaration or other information in support of the motion for TRO.

The 39 Named Plaintiffs for whom factual information is alleged are healthcare providers, healthcare staff, teachers, school staff, one school volunteer, and one state government executive agency employee, who object, in some manner, to the Vaccine Orders. The designation "Jane/John Does" refers to "the many other similarly situated individuals who want to join this lawsuit and may do so in the future." Compl. ¶ 48. Of the 39 described Plaintiffs, two received a vaccine. *Id.* ¶¶ 23, 29. The remaining 37 either specifically state that they did not receive a vaccine or do not offer information on their vaccination status. Of these 37 remaining Plaintiffs, 13 have already received exceptions from their employers, either on medical or religious grounds.[23] *Id.* ¶¶ 11, 13, 16-21, 26, 31, 39-41. Several Plaintiffs, however, state that

---

residential facilities, residential behavioral health facilities, adult foster homes, group homes, pharmacies, hospice, vehicles or temporary sites where health care is delivered (for example, mobile clinics, ambulances), and outpatient facilities, such as dialysis centers, health care provider offices, behavioral health care offices, urgent care centers, counseling offices, offices that provide complementary and alternative medicine such as acupuncture, homeopathy, naturopathy, chiropractic and osteopathic medicine, and other specialty centers.

OAR 333-019-1010(2)(e)(A).

[23] Plaintiffs' employers have provided Plaintiffs with different accommodations. For example, some Plaintiffs with exceptions object to the accommodation that they be required to "eat in isolation when indoors." *Id.* ¶ 21; *see also id.* ¶ 19. The accommodation provided to another Plaintiff with a religious exception is unpaid leave. *Id.* ¶ 40.

they do not believe that they should have to request an exception, so it appears that those Plaintiffs did not try to get an exception. ECF 1 at 43, 46, 47, 62, 64. Ten of the identified Plaintiffs are involved in schools in some capacity. Compl. ¶¶ 9, 17, 19-23, 25, 43, 44. One is a State employee who is a volunteer firefighter and paramedic. *Id.* ¶ 16. The remaining Plaintiffs work in health care. Of those who work in health care, three work remotely, *id.* ¶¶ 10, 35, 47, and five appear to own their own healthcare practices, *id.* ¶¶ 15, 24, 32, 36, 41. One Plaintiff owns a business who contracts with a healthcare practice. *Id.* ¶ 46.

## DISCUSSION

### A. *Jus Cogens* and the Standard of Review

#### 1. Whether *Jus Cogens* Norms Apply

Plaintiffs argue that because they are challenging vaccine mandates and contend that they are being coerced to take "experimental" medication, their constitutional claims should be reviewed under a standard of review higher than strict scrutiny. Plaintiffs assert that the Vaccine Orders coerce their participation in a medical experiment that violates the norms of *jus cogens*[24] recognized in the Nuremberg Code. Thus, conclude Plaintiffs, the standard of review must be "no derogation permitted."

The Ninth Circuit has suggested that *jus cogens* norms are justiciable in U.S. federal courts in domestic cases. *United States v. Struckman*, 611 F.3d 560, 576 (9th Cir. 2010). It is an

---

[24] "*Jus cogens*, the literal meaning of which is 'compelling law,' is the technical term given to those norms of general international law that are argued as hierarchically superior." Kamrul Hossain, *The Concept of Jus Cogens and the Obligation Under the U.N. Charter*, 3 SANTA CLARA J. INT'L L. 72, 73 (2005); *see also United States v. Struckman*, 611 F.3d 560, 576 (9th Cir. 2010) ("*Jus cogens* norms are a subset of 'customary international law'; 'customary international law' is defined as the general and consistent practice of states followed by them from a sense of legal obligation. These norms, which are derived from values taken to be fundamental by the international community are binding on all nations and cannot be preempted by treaty." (simplified)).

"exacting standard," however, and a plaintiff must show the *jus cogens* rights asserted through "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *Id.* In other words, the plaintiff must provide "international law materials concerning the *jus cogens* rights he asserts . . . that address the application of the asserted rights under the circumstances of this case." *Id.*

Plaintiffs concede that if COMIRNATY® was the vaccine being injected in the United States, Plaintiffs' argument based on *jus cogens* would not succeed because, as Plaintiffs acknowledge, COMIRNATY® is not experimental. Plaintiffs assert, however, that there are "no" doses of COMIRNATY® that are generally available in the United States and that the differences between COMIRNATY® and the Pfizer-BioNTech Vaccine that is available are material. This fact, according to Plaintiffs, warrant the application of the *jus cogens* norms against a coerced medical "experiment."

There are several flaws in Plaintiffs' *jus cogens* argument. The first begins with the evidence showing that Pfizer-BioNTech developed an mRNA vaccine in 2020 and tested it in clinical trials. On December 11, 2020, Pfizer-BioNTech received an EUA for that vaccine in the United States under the name "Pfizer-BioNTech COVID-19 Vaccine," and on December 21, 2020, Pfizer-BioNTech receive conditional marketing approval in the EU for that same vaccine under the name "COMIRNATY®." The FDA approval on August 23, 2021 was for the *physically, chemically, and biologically identical vaccine*.

The FDA continued with the EUA for the Pfizer-BioNTech Vaccine, alongside the approved license for the brand name COMIRNATY®, and there are "legal" differences between the two. The vaccines themselves, however, have the same formulation, are interchangeable, and are identical for safety and effectiveness. Thus, the actual vaccine that is being injected is not

materially different, whether it is COMIRNATY® or the Pfizer-BioNTech Vaccine. Plaintiffs

offer no international law authorities supporting the conclusion that physically, chemically, and

biologically identical vaccines that are merely legally distinct are nevertheless so different that a

vaccine mandate involving one versus the other, when one has been FDA-approved as safe and

effective, is a forced medical "experiment."

Second, even assuming that Plaintiffs are correct that the Pfizer-BioNTech Vaccine is

materially different and that COMIRNATY® is generally unavailable in Oregon, Plaintiffs' *jus*

*cogens* argument stills fails because Plaintiffs offer no international law materials that vaccine

mandates, particularly during a worldwide pandemic, for an FDA-authorized vaccine that has

undergone significant clinical trials and safety evaluation by the FDA is considered a forced or

coerced medical "experiment." It is Plaintiffs' burden to show *jus cogens* rights under the

circumstances of a particular case. *See Struckman*, 611 F.3d at 576. Here, Plaintiffs simply

equate by *ipse dixit* the circumstances in this case to an impermissible medical experiment

prohibited under the Nuremberg Code. The Nuremberg Code, however, stems from an opinion

issued by one of the Nuremberg Military Tribunals at the Nuremberg Trials of fifteen Nazi war

criminal doctors convicted of war crimes and crimes against humanity for conducting medical

experiments on persons against their will. *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 177-78 (2d

Cir. 2009).

Although the forced medical experiments there included experimental immunizations, *id.*

at 178, Plaintiffs here do not contend that they are being forced to be part of the *clinical trials* for

the Pfizer-BioNTech Vaccine or that they are being forcibly injected while being physically held

against their will. Instead, they argue a very different context—a challenge to a vaccine mandate

issued in a public health emergency that orders a particular subset of Oregon workers to take an

FDA-authorized vaccine at the risk of losing their employment. This simply is nowhere near the same as Nazi doctors performing experiments on victims held against their will in concentration camps, as was the subject of a portion of the Nuremberg Trials. Plaintiffs offer no support, let alone meet the demanding *jus cogens* "exacting standard," showing that under the present circumstances there is an accepted international norm concluding that the challenged conduct here is considered to be prohibited "medical experimentation."[25] *Struckman*, 611 F.3d at 576.

The third flaw with Plaintiffs' *jus cogens* argument is that Plaintiffs remain free to choose whether to get the vaccine. The Vaccine Orders give individuals the choice either to get a vaccine, to apply for a religious or medical exception (exempting the person from the requirement to get a vaccine), or to find employment elsewhere, including potentially in another state. Plaintiffs have not shown that the international community collectively condemns this type of choice as the type of coercion that falls within the prohibition of the Nuremberg Code, particularly during a global pandemic and when the vaccine is FDA-authorized. The "no derogation permitted" demanding standard does not apply here because Plaintiffs have not met their high burden of showing that the Vaccine Orders implicate the *jus cogens* norm to be free from coerced medical experimentation. The Court next considers what standard of review to apply under the well-established constitutional framework.

---

[25] Plaintiffs also argue that because vaccines given EUAs are considered "investigational," ECF 3-10, they are necessarily "experimental." Even if the terms "experimental" and "investigational" are interchangeable, which they do not appear to be, that does not mean that mandating "experimental" vaccines is the equivalent of a "medical experiment" as that term is used in the Nuremberg Code. Again, Plaintiffs must meet their burden under the "exacting standard" of *jus cogens*, and merely because something is labeled an "experimental" treatment as that term of art is used in different contexts does not make it violative of the Nuremberg Code.

### 2.  Traditional Standards of Review

Plaintiffs argue that their "fundamental" liberty interest not to be coerced into taking experimental medical treatment is being infringed. Thus, the Court understands Plaintiffs to be arguing that if *jus cogens* norms do not apply, then the Court should apply strict scrutiny.

Before the modern tiers of constitutional judicial scrutiny (*e.g.*, rational basis and strict scrutiny), the Supreme Court analyzed a vaccine mandate in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The Supreme Court focused on whether the imposition of the vaccine mandate was "arbitrary" or "necessary in order to protect the public health and secure the public safety" and noted that individual liberty is subject to "reasonable regulations" as general safety demands. *Id.* at 25-29. The Supreme Court has described *Jacobson* as applying rational basis review. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) ("Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review to Henning Jacobson's challenge to a state law that, in light of an ongoing smallpox pandemic, required individuals to take a vaccine, pay a $5 fine, or establish that they qualified for an exemption."). Other courts similarly have applied rational basis review to vaccine mandates. *See Zucht v. King*, 260 U.S. 174, 176-77 (1922) (citing *Jacobson* and stating that the vaccine mandate in question "confer[red] not arbitrary power, but only that broad discretion required for the protection of the public health"); *Doe v. Zucker*, 520 F. Supp. 3d 217, 253-54 (N.D.N.Y. 2021) (citing *Jacobson* and applying rational basis review to the State of New York's vaccine requirements for schools that did not provide for medical exemptions). This includes courts considering vaccine mandates issued during the COVID-19 pandemic, including mandates issued before the FDA approved the Pfizer-BioNTech Vaccine. *See Dixon v. De Blasio*, 2021 WL 4750187, at *8-9 (E.D.N.Y. Oct. 12, 2021); *Norris v. Stanley*, --- F. Supp. 3d ---, 2021 WL 4738827, at *1 (W.D. Mich. Oct. 8, 2021); *Kheriaty v. Regents of the*

*Univ. of Cal.*, 2021 WL 4714664, at *6 (C.D. Cal. Sept. 29, 2021); *Children's Health Def., Inc.*

*v. Rutgers State Univ. of N.J.*, 2021 WL 4398743, at *6 (D.N.J. Sept. 27, 2021); *Maniscalco*

*v. N.Y.C. Dep't of Educ.*, 2021 WL 4344267, at *5 (E.D.N.Y. Sept. 23, 2021); *Valdez v.*

*Grisham*, --- F. Supp. 3d ---, 2021 WL 4145746, at *5-6 (D.N.M. Sept. 13, 2021); *Harris v.*

*Univ. of Mass., Lowell*, 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021); *Am.'s Frontline Drs.*

*v. Wilcox*, 2021 WL 4546923, at *4 (C.D. Cal. July 30, 2021); *Klaassen v. Trs. of Ind. Univ.*,

--- F. Supp. 3d ---, 2021 WL 3073926, at *26 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th

Cir. 2021).

Plaintiffs, however, argue that none of these cases are relevant because they either were

not considering an "experimental" vaccine or did not properly consider that the vaccine was not

yet approved by the FDA. For the reasons discussed above in rejecting Plaintiffs' *jus cogens*

argument, the Court does not find this fact to be dispositive on the standard of review under the

circumstances of this case.

Plaintiffs fail to demonstrate that their preference not to receive an FDA-authorized

vaccine is a fundamental right under the Due Process Clause. The Supreme Court has not

recognized any fundamental right to refuse vaccination. Plaintiffs therefore ask the Court to infer

from Supreme Court precedent that it would do so. The Supreme Court, however, has cautioned

against recognizing new fundamental rights under the Due Process Clause. *See Washington v.*

*Glucksberg*, 521 U.S. 702, 720 (1997) ("[W]e have always been reluctant to expand the concept

of substantive due process because guideposts for responsible decisionmaking in this unchartered

area are scarce and open-ended." (simplified)). Before recognizing a new fundamental right, the

Supreme Court employs a two-step analysis. *Id.* at 720-21. First, the right at issue must be

carefully and narrowly defined. *Id.* at 721. Second, the Supreme Court considers whether that

carefully described right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id.* at 720-21.

On the latter questions, the *Jacobson* decision is instructive. In *Jacobson*, the appellant challenged a statute passed by the Massachusetts legislature that authorized the board of health of any city or town to require the vaccination and revaccination of the town's inhabitants over the age of 21 or a $5 penalty, if necessary for the public health or safety. *Jacobson*, 197 U.S. at 12. Under this statute, the board of health in Cambridge, Massachusetts issued a smallpox vaccine mandate and only allowed exceptions for children. *Id.* at 12-13. The appellant refused to be vaccinated, was criminally charged, and was convicted by a jury. *Id.* at 13. The appellant argued that the Massachusetts' statute under which the Cambridge vaccine mandate was issued violated the appellant's constitutional rights. *Id.* at 13-14.

The Supreme Court recognized that the Commonwealth of Massachusetts' "police power" included, within constitutional bounds,

> the authority of a State to enact quarantine laws and 'health laws of every description'; indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other States. According to settled principles, the police power of a State must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.

*Id.* at 25. In rejecting the appellant's argument that Massachusetts' vaccine mandate law was an unlawful exercise of police power because it violated the appellant's constitutional rights, the Supreme Court explained that the Constitution "does not import an absolute right" to be free from restraint, that there are "manifold restraints" that are necessary "for the common good," and that without some restraints "an organized society could not exist with safety to its members." *Id.* at 26. With respect to public health measures based on science, the Supreme Court added that "[t]he possibility that the belief may be wrong, and that science may yet show it to be wrong, is

not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases." *Id.* at 35 (quotation marks omitted).

As *Jacobson* reveals, the right to refuse vaccination is not deeply rooted in this nation's history. *See id.* at 26 ("But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good."). In fact, the opposite is true. *See, e.g.*, *Zucht*, 260 U.S. at 176 (stating that it is "settled that it is within the police power of a state to provide for compulsory vaccination"). Public health laws that protect the health and well-being of the general population further the concept of ordered liberty. In public health emergencies, the people rely on their government officials to implement policies that balance the interests of personal autonomy and the safety of the general population. For example, in the face of a highly contagious disease, the general population must rely on the actions of others to ensure their own safety. Thus, the right to refuse general health measures, including the right to refuse vaccination, is not implicit in the concept of ordered liberty. *See Jacobson*, 197 U.S. at 29 ("But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.").

Other courts agree that the right to refuse vaccination is not a fundamental right. *See Dixon*, 2021 WL 4750187, at *8 ("[T]he right to refuse vaccination is not a fundamental right . . . ."); *Norris*, 2021 WL 4738827, at *2 ("[T]here is no fundamental right to decline a

PAGE 27 – OPINION AND ORDER

vaccination."); *Valdez*, 2021 WL 4145746, at *5 (concluding that the right to refuse vaccination is not a fundamental right and stating that "federal courts have consistently held that vaccine mandates do not implicate a fundamental right and that rational basis review therefore applies in determining the constitutionality of such mandates"); *Klaassen*, 2021 WL 3073926, at *23-24 (concluding that the right to refuse vaccination is not a fundamental right and stating that "[v]accines address a collective enemy, not just an individual one").

In sum, under *Jacobson* followed by "over a century's worth of rulings" with "the consistent use of rational basis review to assess mandatory vaccination measures," rational basis review applies to Plaintiffs' claims in this case. *Klaassen*, 2021 WL 3073926, at *24. What the Court construes as Plaintiffs' alternative argument to *jus cogens* that strict scrutiny applies is rejected because the right to refuse FDA-authorized vaccines is not a fundamental right. Accordingly, the Court will assess the constitutionality of the Vaccine Orders under rational basis review. Under rational basis review, the state conduct is presumed valid and will be upheld so long as it is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

## B. Likelihood of Success on the Merits

### 1. Substantive Due Process Claim

Substantive due process rights safeguard individuals against "arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013) ("Substantive due process protects individuals from arbitrary deprivation of their liberty by government." (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006))). Plaintiffs' substantive due process claim is based on alleged abusive executive action from the governor of Oregon and an Oregon administrative agency. The Supreme Court has emphasized "that only the most egregious official conduct can be said to be

'arbitrary in the constitutional sense,'" in such cases. *County of Sacramento v. Lewis*, 523

U.S. 833, 846 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). "[I]n a due

process challenge to executive action, the threshold question is whether the behavior of the

governmental officer is so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience." *Id.* at 847 n.8; *see also Sylvia Landfield*, 729 F.3d at 1195 ("To

constitute a violation of substantive due process, the alleged deprivation must shock the

conscience and offend the community's sense of fair play and decency." (quotation marks

omitted)). "[The Supreme] Court has said that the 'shock the conscience' standard is satisfied

where the conduct was 'intended to injure in some way unjustifiable by any government

interest,' or in some circumstances if it resulted from deliberate indifference." *Rosales-Mireles v.*

*United States*, 138 S. Ct. 1897, 1906 (2018) (quoting *County of Sacramento*, 523 U.S. at 849-

50).

Plaintiffs argue that the Vaccine Orders violate Plaintiffs' due process rights because the

Vaccine Orders force Plaintiffs to take "experimental" vaccines without Plaintiffs' consent. As

discussed above, Plaintiffs have shown no scientific, biological, or formulaic difference between

the actual drug in the vial of the Pfizer-BioNTech Vaccine and the one in the vial of the

COMIRNATY® vaccine. They have the same formulation and are interchangeable. The Court

does not find that any legal differences, such as potential liability immunity for Pfizer and

BioNTech, are enough to support a likelihood, or even serious questions, that the Vaccine Orders

are forcing Plaintiffs to take experimental medication such that it shows that Governor Brown

and the OHA intended to injure or were deliberately indifferent to injuring Plaintiffs.

Further, even if the Pfizer-BioNTech Vaccine were materially different from

COMIRNATY®, Plaintiffs fail to show that they are likely to succeed, or even raise serious

questions, that the Vaccine Orders "shock the conscience" or that the state action is not rationally related to any legitimate state interest. The Vaccine Orders are rationally related to Defendants' interests in slowing the spread of COVID-19, protecting Oregon's citizens, protecting children and teachers in schools, and preserving healthcare resources and protecting patients. *See Peinhopf v. Leon Guerrero*, 2021 WL 2417150, at *5 (D. Guam June 14, 2021) ("[T]his court finds that 'the notion that restrictions designed to save human lives [from COVID-19] are "conscious shocking" to be absurd and not worthy of serious discussion.'" (quoting *Herrin v. Reeves*, 2020 WL 5748090, at *9 (N.D. Miss. Sept. 25, 2020) (second alteration in original)).

The COVID-19 pandemic has and continues to wreak havoc on the State of Oregon, the United States, and the world at large. After infection rates declined in June 2021, the Delta variant caused significant increases in the infection rate Oregon. On August 16, 2021, Oregon reached its highest level of cases for the entire pandemic. Hospitalizations also were climbing, with Oregon reaching its record for hospitalizations on September 1, 2021. The Delta variant was (and remains) the dominant variant in Oregon. Unvaccinated persons made up (and continue to make up) the significant majority of cases, hospitalizations, and deaths. The EO was issued on August 13, 2021, and the Education Order and Healthcare Order were issued on August 25, 2021, during the height of the Delta surge.

As U.S. District Judge Damon R. Leichty explained in *Klaassen*,

> the Constitution doesn't permit the government to declare a never-ending public emergency and expand its powers arbitrarily. Instead, as our country and communities progress through a pandemic, the government must continually update its practices in light of the most recent medical and scientific developments. And a law or policy should be written with a mindset that medicine and science, and the circumstances that they create, will evolve, and so must the law or policy evolve or be revisited in amendment.

*Klaassen*, 2021 WL 3073926, at \*22. The Healthcare Order and Education Order are temporary and expire by their own terms within months. The EO remains in effect until further order of Governor Brown, but it contains a description of the surge in cases, hospitalizations, and deaths caused by the Delta variant, and a focus on medicine and science. It does not support an inference that the State does not intend to evolve or adapt as the pandemic changes. Indeed, the nature and timing of the Vaccine Orders show that the State is evolving and taking different approaches to different phases of the pandemic.

Plaintiffs argue that the vaccines do more harm than good, relying their expert witness's analysis of the Vaccine Adverse Event Reporting System (VAERS). ECF 5. VAERS is a self-reporting database hosted by the CDC in which any healthcare provider, public health official, or private citizen can report an adverse event. ECF 14, ¶ 19. VAERS shows a dramatic uptick in reported adverse incidents in 2021. ECF 5. ¶¶ 6. Putting aside the question of the reliability of VAERS, causal links versus temporal links, and whether the uptick may be attributable in large part to the hundreds of millions of doses of vaccines administered in 2021, the issue before the Court is not to analyze the safety of the vaccines or whether the Vaccine Orders are the best (or even a good) policy. The Court is evaluating (accepting Plaintiff's argument differentiating the EUA and FDA-approved vaccines), whether Plaintiffs have shown a likelihood of success that the State's decision in issuing the Vaccine Orders is so arbitrary that it is not rationally related to any governmental interest and therefore shocks the conscience.

Plaintiffs focus solely on the lack of FDA approval, but the Pfizer-BioNTech Vaccine has been under an FDA EUA since December 11, 2020. As explained above, in the EUA letters and Fact Sheets the FDA described the vaccine's significant clinical trials and the FDA's safety evaluation that was performed before the FDA issued the emergency authorization. Oregon's

Governor and public health officials considered the public health emergency, the available treatment options, and the efficacy of the vaccines, and determined the best course of action. Plaintiffs argue that Governor Brown could have encouraged the use of Ivermectin rather than mandate vaccines, or let people do nothing. In resolving this motion, it is not the Court's role to second-guess state conduct simply because Plaintiffs present an alternative method of pursuing the state's interest. *Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease."). This is especially so when the state exercises its police powers to mitigate harm in a public health emergency. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, CJ, concurring) ("When [public] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (simplified)).

The decision to require vaccination among state executive agency employees, and critical populations such as healthcare workers and providers and education workers and volunteers, is a rational way to further the State's interest in protecting health and safety during the COVID-19 pandemic. *See, e.g.*, *Peinhopf*, 2021 WL 2417150, at *5 ("The court finds that Defendants had a legitimate reason for issuing the Executive Orders and Guidance Memos; and that is, to safeguard public health and contain the virus's spread."). Plaintiffs are not likely to succeed in showing that the Vaccine Orders shock the conscience and thus violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.

### 2.  Privileges or Immunities Claim

Plaintiffs allege in their Second Claim for Relief that the Vaccine Orders violate the Privileges or Immunities Clause of the Fourteenth Amendment (the Privileges or Immunities Clause).[26] Plaintiffs allege that they have a fundamental right to "not to be coerced into taking experimental medication." Compl. ¶ 123. Plaintiffs contend that right is "essential to the preservation of liberty," is "inherently possessed by human beings," and "has been explicitly recognized as a fundamental human right since World War II." *Id.* Defendants respond that, after the Supreme Court's decision in the *Slaughter-House Cases*, 83 U.S. 36 (1872), courts have consistently interpreted the Privileges or Immunities Clause as a "nugatory," *Paciulan v. George*, 229 F.3d 1226, 1229 (9th Cir. 2000), and that Plaintiffs provide no caselaw to support the application of the Clause here.

The Privileges or Immunities Clause provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ." U.S. Const. amend. XIV, § 1, cl. 2. As interpreted by the Supreme Court, the Privilege or Immunities Clause of the 14th Amendment secures only a very narrow class of rights, the most well-established of which is the right to travel. *Saenz v. Roe*, 526 U.S. 489, 503 (1999). As the Ninth Circuit has explained:

> [T]he Supreme Court drew tight boundaries around the Privileges
> or Immunities Clause of the Fourteenth Amendment in the
> *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 21 L. Ed. 394
> (1872). The Court ruled that the clause only secures those rights
> which "own their existence to the Federal government, its National
> character, its Constitution, or its laws." *Id.* at 79. Some examples

---

[26] Plaintiffs refer to the "Privileges *and* Immunities Clause of the Fourteenth Amendment," and cite "U.S. CONST. amend XIV, § 1." The Court, however, construes the Complaint as referring to the Privileges *or* Immunities Clause of the Fourteenth Amendment, section 1, rather than the Privileges *and* Immunities Clause of Article IV, section 2 of the Constitution. They are two distinct clauses.

of Federal privileges or immunities protected by the Fourteenth
Amendment listed by the Supreme Court were the right to petition
the Federal government and to "demand the care and protection of
the Federal government over his life, liberty, and property when on
the high seas." *Id.* at 79. However, the Court made it very clear
that the traditional privileges and immunities of citizenship "which
are, in their nature, fundamental; which belong, of right, to the
citizens of all free governments," such as the right to engage in
one's profession of choice . . . were not protected by the Privileges
or Immunities Clause if they were not of a "federal" character.
*Slaughter-House Cases*, 83 U.S. (16 Wall.) at 78-79.

*Merrifield v. Lockyer*, 547 F.3d 978, 983 (9th Cir. 2008).

Plaintiffs do not argue that the right they view themselves as asserting—the right not to

take an experimental vaccine—is fundamentally "federal" in character, such that it is protected

by the Privileges or Immunities Clause. In fact, their argument rests on the fact that the right is

inherent to humanity, recognized worldwide as an unassailable norm, and thus cannot be

abridged.[27] Rather, Plaintiffs cite only to Justice Thomas' concurrence in *McDonald v. City of

Chicago*, in which Justice Thomas—joined by no other Justices—proposed a rejection of the

*Slaughter-House Cases*. 561 U.S. 742, 855 (2010) (Thomas, J., concurring in part and concurring

in the judgment).

These arguments are not only unresponsive to, but also in direct contradiction with, the

Privileges or Immunities Clause jurisprudence from both the Supreme Court and the Ninth

---

[27] Plaintiffs depend heavily on concepts of international law, including *jus cogens*, to
support their claim, but do not articulate how those principles apply to the claims they bring.
Specifically, Plaintiffs cite *Abdullahi v. Pfizer, Inc.*, in which the Second Circuit in an Alien Tort
Claims Act case cited the Nuremberg Code and concluded that "since Nuremberg, states
throughout the world have shown through international accords and domestic law-making that
they consider the prohibition on nonconsensual medical experimentation identified at Nuremberg
as a norm of customary international law." 562 F.3d 163, 179 (2d Cir. 2009). Plaintiffs, however,
cite no authority in which a United States federal court has found that a violation of the norms of
customary international law give rise to a claim under the Privileges or Immunities Clause of the
Fourteenth Amendment.

Circuit, which requires that the rights asserted "own their existence to the Federal government, its National character, its Constitution, or its laws." *Slaughter-House Cases*, 83 U.S. at 79; *see also Merrifield*, 547 F.3d at 983.[28] Thus, the Court finds that Plaintiffs are not likely to succeed, or even raise serious questions, on the merits of their Privileges or Immunities Clause claim.

### 3. Supremacy Clause Claim

Plaintiffs argue that the Vaccine Orders conflict with federal informed consent laws associated with EUA medical products and thus violates the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2. Specifically, Plaintiffs contend that the FDA-approved vaccine COMIRNATY® is unavailable in the United States and that medical providers continue to use the Pfizer-BioNTech Vaccine, which only received an EUA and not FDA approval.

As discussed, the Pfizer-BioNTech Vaccine and COMIRNATY® are identical in all material respects. Even if COMIRNATY® and the Pfizer-BioNTech Vaccine were materially distinct and that medical providers administer the Pfizer-BioNTech Vaccine in place of COMIRNATY®, Plaintiffs fail to show that they are likely to succeed, or even raise serious questions, on the merits of their Supremacy Clause claim. The Supremacy Clause does not provide an independent cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) ("It is equally apparent that the Supremacy Clause is not the source of any federal rights, . . . and certainly does not create a cause of action." (simplified)). In addition, the Vaccine Orders likely do not violate EUA informed consent laws for at least three reasons.

---

[28] It is also worth noting that it is not clear that Plaintiffs are, in fact, asserting a right to refuse experimental medical care. Rather, Plaintiffs appear to be asserting that they have a right to engage in the profession of their choosing—which Defendants are, ostensibly, preventing them from doing by imposing a vaccine mandate. Insofar as the right asserted is the right to engage in one's chosen profession, the Ninth Circuit has held that such a right is not subject to the protections of the Privileges or Immunities Clause. *See Merrifield*, 547 F.3d at 983-84.

First, the statute providing for EUA protocols only applies to the Secretary of Health and

Human Services. 21 U.S.C. § 360bbb-3(e)(1)(A). The statute provides:

> With respect to the emergency use of an unapproved product, *the Secretary*, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, *for a person who carries out any activity for which the authorization is issued*, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> * * * *
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> > (I)     that the Secretary has authorized the emergency use of the product;
> >
> > (II)    of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
> >
> > (III)   of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

*Id.* (emphasis added).

In other words, the statute directs the Secretary of Health and Human Services to

establish conditions that ensure recipients of EUA medical products give informed consent.

Further, as other courts have held, those conditions of informed consent only relate to those who

"carr[y] out any activity for which the authorization is issued," which are the medical providers

who administer the vaccine, not those who issue vaccine mandates. *See, e.g.*, *Valdez*, 2021

WL 4145746, at *4 (stating that 21 U.S.C. § 360bbb-3(e)(1)(A) only applies to medical

providers who are "directly administering the vaccine"); *Klaassen*, 2021 WL 3073926, at *25

(stating that the parties agreed that the statute only applied to those administering the vaccine).

Plaintiffs have not named the Secretary of Health and Human Services or any medical providers responsible for administering the vaccine and thus their claim that Defendants violated 21 U.S.C. § 360bbb-3(e)(1)(A) is not likely to succeed.

Second, even assuming the informed consent requirements of 21 U.S.C. § 360bbb-3(e)(1)(A) apply to Defendants, Plaintiffs have demonstrated that they can give informed consent. Plaintiffs have access to information that 21 U.S.C. § 360bbb-3(e)(1)(A) requires. Plaintiffs submitted informational fact sheets for the Pfizer-BioNTech, Moderna, and Johnson & Johnson's EUA vaccines, which disclose that the EUA vaccines are not FDA approved, that recipients may refuse the vaccine, and the significant known and potential risks and benefits of the vaccines. *See* ECF 3-4, at 11; ECF 3-6, at 5; ECF 3-8, at 4; This information, however, satisfies the requirements of 21 U.S.C. § 360bbb-3(e)(1)(A). *See* U.S. Dep't Just. Off. Legal Couns., *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*, 45 Ops. Off. Legal Couns., --- (July 6, 2021) (slip op. at 1, 7-8), https://www.justice.gov/olc/file/1415446/download (concluding that 21 U.S.C. § 360bbb-3(e)(1)(A)(ii) does not prohibit public or private entities from mandating EUA vaccination and only concerns "the provision of information to potential vaccine recipients").

Finally, Plaintiffs may choose whether to receive the vaccine. The Vaccine Orders presents Plaintiffs with a difficult choice, but it is nevertheless a choice. Plaintiffs may either get the vaccine, apply for an exception, or look for employment elsewhere. *See Norris*, 2021 WL 4738827, at *3 n.2 ("MSU's policy does not preclude Plaintiff from receiving informed consent, nor does it prevent her from accepting or refusing administration of the vaccine. Rather,

the vaccine is a condition of employment, which Plaintiff does not have a constitutionally protected interest in. There is no preemption issue here.").

In sum, Plaintiffs have not demonstrated a likelihood of success, or serious questions, on their Supremacy Clause claim for four reasons: (1) the Supremacy Clause does not provide an independent cause of action, (2) the EUA statute applies to Secretary of Health and Human Services, or, at most, medical providers giving the vaccines, and not to Defendants, (3) Plaintiffs can give their informed consent as required under 21 U.S.C. § 360bbb-3(e)(1)(A), and (4) Plaintiffs can choose not to get the vaccine.

### 4. Oregon State Law Claim

Plaintiffs' Fourth Claim for Relief alleges that "Defendants' coercion of Plaintiffs into taking experimental medication unlawfully interferes with their choice of treatment against COVID-19 in violation of ORS § 431.180." Compl. ¶ 130. Plaintiffs request injunctive relief on that basis. As relevant to Plaintiffs' claim, ORS § 431.180(1) provides that no public health law of Oregon shall be construed as "authorizing the Oregon Health Authority or its representatives, or any local public health authority or its representatives, to interfere in any manner with . . . [an] individual's choice of mode of treatment." Plaintiffs allege that the Vaccine Orders coerce Plaintiffs into getting a COVID-19 vaccine, thereby interfering with their choice of mode of treatment, in violation of ORS § 431.180(1). Defendants argue that federal courts are barred by the Eleventh Amendment[29] from enjoining state officials acting in their official capacities to comply with state laws. At oral argument, Plaintiffs' counsel conceded that the Eleventh Amendment likely applies to bar Plaintiffs' state law claim.

---

[29] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

Under the Eleventh Amendment, federal courts may not entertain a lawsuit brought by a citizen against a state, its agencies, or departments without the state's consent. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The Eleventh Amendment bars federal courts from providing forward-looking relief against a state official based on state law. *Pennhurst*, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); *see also Hale v. State of Arizona*, 967 F.2d 1356, 1369 (9th Cir. 1992), *affirmed on reh'g*, 993 F.2d 1387 (9th Cir. 1993) ("[T]he Eleventh Amendment deprives federal courts of jurisdiction to order state actors to comply with state law.").

Thus, Plaintiffs' state statutory argument cannot provide a basis for the injunctive relief Plaintiffs request because Defendants have sovereign immunity from this Court's jurisdiction to issue an injunction instructing state officials on how to conform their conduct to state law.[30]

---

[30] Defendants, citing cases from the Eleventh Circuit, describe that the "nature of the [Eleventh Amendment's] prohibition is one of subject matter jurisdiction and cannot be waived by the parties." ECF 13 at 14 (citing *Smith v. Avino*, 91 F.3d 105 (11th Cir. 1996), and *Hughes v. Ala. Dep't of Pub. Safety*, 994 F. Supp. 1395 (M.D. Ala. 1998)). The Ninth Circuit, however, has described the prohibition of the Eleventh Amendment differently, holding that "the Eleventh Amendment is not a true limitation upon the court's subject matter jurisdiction, but rather a personal privilege that a state may waive." *Hill v. Blind Indus. & Servs. of Maryland*, 179 F.3d 754, 760 (9th Cir.), *opinion amended on denial of reh'g*, 201 F.3d 1186 (9th Cir. 1999). No party here, however, has argued that the state waived its sovereign immunity such that the relief they request would be permissible under the Eleventh Amendment, and thus the Court need not address Defendants' contention that the prohibition is one of subject-matter jurisdiction that cannot be waived.

Because the Court cannot provide the relief that Plaintiffs seek, Plaintiffs are not likely to succeed on the merits of their state law claim.

## C.  Irreparable Harm

### 1.  Time under Consideration

In considering the timeframe for Plaintiffs' alleged irreparable harm for their motion for TRO, the Court is persuaded by the Supreme Court's reasoning in *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423 (1974). In that case, the Supreme Court discussed the importance of the time limitations in Rule 65(b) of the Federal Rules of Civil Procedure, which apply to *ex parte* TROs, and which had their origin in Section 17 of the Clayton Act of 1914, 38 Stat. 737. *Id.* at 438. The Supreme Court noted that *ex parte* TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Id.* at 439. This is because the defendant did not receive notice and time to respond, allowing for the possibility of "ill-considered injunctions." *Id.* at 438.

Here, Plaintiffs chose to wait two months from the date of Governor Brown's Executive Order and only four court days before implementation of the Vaccine Orders begins to file their Complaint and motion for TRO and preliminary injunction. Plaintiffs then requested expedited consideration, asking that the Court decide the TRO motion before October 18th. Plaintiffs also filed 357 pages of often highly technical information in support of their motion, including 72 pages for their expert declaration and supporting materials. Plaintiffs raise technical, medical, and scientific arguments and evidence regarding the COVID-19 vaccines, particularly the Pfizer-BioNTech Vaccine, as well as multiple legal theories and claims. Plaintiffs also filed supplemental materials after the hearing.

Although not an *ex parte* TRO, because of Plaintiffs' delay in filing this case and the accompanying TRO motion, the volume of materials filed by Plaintiffs, the subject matter of this case, and the expedited briefing that was necessary for the Court to consider Plaintiffs' motion before the October 18, 2021 implementation date for the Vaccine Orders, Defendants have been deprived of a meaningful opportunity to respond to Plaintiffs' motion. Thus, the Court considers whether Plaintiffs have shown irreparable harm only until the time necessary to hold a preliminary injunction hearing.

### 2.   Analysis

#### a.   Constitutional violations

Plaintiffs contend that they have sufficiently shown irreparable harm because their constitutional rights are being violated. The Court assumes without deciding that any constitutional violation would result in presumed irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *cf.* Beatrice Catherine Franklin, *Irreparability, I Presume? On Assuming Irreparable Harm for Constitutional Violations in Preliminary Injunctions*, 45 COLUM. HUM. RTS. L. REV. 623, 634-45 (2014) (describing the circumstances under which courts presume irreparable harm for certain constitutional provisions).

Because the Court does not find that Plaintiffs are likely to succeed in their constitutional claims, however, Plaintiffs have not shown that they are likely to suffer irreparable harm based on the alleged violation of their constitutional rights. Thus, Plaintiffs must demonstrate that they are likely to suffer imminent irreparable injury. *See, e.g.*, *McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) ("Because McNeilly does not have a likelihood of success on the merits, as discussed above, his argument that he is irreparably harmed by the deprivation of his First

Amendment rights also fails."); *Am.'s Frontline Drs. v. Wilcox*, 2021 WL 4546923, at \*7 (C.D.
Cal. July 30, 2021) ("But, for the reasons discussed above, Plaintiffs' constitutional claims are
unlikely to succeed. Plaintiffs' claims that the Policy violates their constitutional rights are thus
insufficient to establish irreparable harm."); *Marin All. For Med. Marijuana v. Holder*, 866 F.
Supp. 2d 1142, 1160 (N.D. Cal. 2011) (rejecting the plaintiffs' argument that their alleged harm
from violations of their constitutional rights constituted irreparable harm because the
presumption of harm "is inapposite where, as here, the plaintiffs fail to demonstrate a sufficient
likelihood of success on the merits of their constitutional claims to warrant the grant of a
preliminary injunction" (simplified)). The Court next considers the claims of imminent injury
asserted by Plaintiffs.

### b.  Loss of employment and benefits and other alleged harms

Plaintiffs argue that they face a likelihood of imminent irreparable harm because they
face the loss of their jobs and associated benefits and other alleged harms. Because different
Plaintiffs allege differing harms, the Court discusses the harms by category.

### i.  No harm

There are no allegations or declarations relating to Plaintiffs Dr. A. Nate Lyons or David
West. Thus, there are no allegations of harm for these Plaintiffs. Accordingly, they fail to show
that they are likely to suffer imminent irreparable harm.

### ii.  Speculative harm

Several Plaintiffs allege harm that is speculative, at most. Plaintiffs Teresa Lynn Karn
and Ms. B already have been vaccinated. Thus, at this time they do not face any adverse
employment consequences as a result of the Vaccine Orders. Ms. B also alleges no future injury.
Ms. Karn alleges that she is "fearful" that in the future the State may require booster shots or
new vaccine requirements. This is speculation.

Plaintiff Ms. D has received a religious exception. She alleges that she is "fearful" that her exception will not be accepted in the future.[31] Similarly, Plaintiff Laine Ewry's employer accepted Ms. Ewry's medical exception. Ms. Ewry states that "if" her employer feels the medical accommodation would violate the Vaccine Orders, then her exception "could change at any time." ECF 1 at 61. Plaintiff Mary Gabriele, M.D. also states that her religious and medical exceptions have been accepted and that she is not currently facing any excessive requirements. ECF 1 at 68. Her fear, however, is that circumstances will "change for the worse" or that the employers who accepted her exceptions will change their policies. These fears by Ms. D, Ms. Ewry, and Dr. Gabriele that their accepted exceptions will be revoked at some point or circumstances will otherwise change are speculative and not sufficiently imminent.

Plaintiff Linda Riser alleges that her religious exception was accepted by St. Charles Medical Center in Bend, but that she was offered only the accommodation of applying for remote work or taking unpaid leave. ECF 1 at 63. If she has to take unpaid leave, she will have to exhaust her earned time off and will be responsible for her insurance premiums. She states, however, that she has applied for remote work. Thus, it is speculative whether she will suffer any harm.[32]

Plaintiff Ms. E states that she applied for a religious exemption and was denied. She also states, however, that her work is 100% remote. She does not allege that she is facing any specific adverse employment consequence as a result of the Vaccine Orders. Ms. E merely states that her

---

[31] Ms. D also alleges that she has been served with a Corrective Action for "sharing factual information" about the mRNA vaccines with a medically-fragile co-worker, but that is not an irreparable injury that would be remedied by a TRO directed at the Vaccine Orders.

[32] As discussed below, even if she must take unpaid leave or pay for her own insurance benefits, those are not irreparable harms because they can be compensated with money damages.

"employment opportunities have been limited." ECF 1 at 80. This vague and speculative
assertion is insufficient to show imminent, irreparable injury.

    Plaintiff Dr. Melanie Crites-Bachert states that she is a Doctor of Osteopathic Medicine
and a surgeon with her own private practice. ECF 1 at 69. Legacy Health terminated Dr. Crites-
Bachert's privileges because she refused to get vaccinated, which caused her to cancel some
surgeries. As a result, she describes that one patient became upset and will now never
recommend any patients to Dr. Crites-Bachert and has "taken to posting such comments" on
Dr. Crites-Bachert's business social media. *Id.* This vague allegation cannot demonstrate
imminent irreparable injury as a result of the Vaccine Orders. For example, Dr. Crites-Bachert
does not identify what comment this patient posted. That might reveal whether the patient was
upset that Dr. Crites-Bachert, in contravention to widely held medical views, refused to get
vaccinated, or whether the patient was upset for another reason, such as the last-minute surgery
cancellation. Dr. Crites-Bachert also does not identify how one patient posting something
negative is likely to result in imminent or irreparable harm to Dr. Crites-Bachert's reputation or
practice. Plaintiff does not describe that these postings have led to any loss of business, and even
if they did, a loss of business generally is considered quantifiable and compensable through
money damages. *See, e.g.*, *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th
Cir. 2019) (rejecting the "potentially viable theory" of irreparable harm—that the plaintiff "was
continuing to lose goodwill with its employees and customers"—because there was "not enough
evidence or analysis to support it"); *Allied Servs., LLC v. Smash My Trash, LLC*, 2021
WL 1671675, at *4 (W.D. Mo. Apr. 28, 2021) (finding that allegations of "loss of goodwill and
reputation" were "speculative in nature and, without more, are insufficient to justify a grant of
injunctive relief" because the plaintiff did not offer particularized evidence of customers

abandoning the business or cancelled contracts and that "even if those allegations were supported by more evidence, Plaintiff still fails to demonstrate how that alleged loss of business is unrecoverable or unquantifiable").

All of these Plaintiffs fail to show a likelihood of imminent irreparable injury. Their fear of future harm is too speculative to support a claim for imminent irreparable injury. *Cottrell*, 632 F.3d at 1131 ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible."); *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable injury.").

### iii. Terms of accommodation

Plaintiffs Adrienne Park,[33] Chad Dillard, Heidi Hopkins, Glenn Hopkins, and Travis Brenneman assert irreparable injury in the form of "onerous" terms of accommodation imposed by their employers. To begin, their employers are not Defendants here and neither Defendants nor the Vaccine Orders dictate the terms of any accommodation. Next, Plaintiffs fail to show how the accommodations constitute irreparable injury. Ms. Park simply states that her terms are onerous, with no detail. The other Plaintiffs describe conditions such as being required to wear N95 masks or other personal protective equipment under certain conditions (such as when in close contact with others or when indoors), take COVID-19 tests weekly, socially distance from others, and eat in isolation when eating indoors. These are not irreparable harms.

### iv. Unpaid leave

Plaintiff Jessie Clark states that she is on medical leave and has been informed that she "does not need to worry about the timeline" of the Vaccine Orders, so long as she is in

---

[33] Ms. Park is named in the Complaint as Adrian Park, but named in her Declaration as Adrienne Park. It appears there is a scrivener's error in the Complaint.

compliance when she returns from medical leave in "weeks to months from now." ECF 1 at 54.

She states that "indications" are that this "will change." *Id.* She alleges that her employer, St.

Charles Medical Center, has publicly stated that unpaid leave is the only accommodation it will

make for exceptions permitted by the Vaccine Orders.[34] Plaintiff Tara Johnson alleges that her

religious exemption was accepted but that her employer, St. Charles Medical Center in Bend,

only allows unpaid leave as an accommodation. For Plaintiff Linda Riser, assuming that she

cannot obtain remote work at St. Charles Medical Center, her accommodation would then be

unpaid leave. Plaintiff Marti Lamb describes that her exception was granted but the only

accommodation offered was unpaid leave. ECF 1 at 67.

Plaintiff Margaret Henson describes that she was released to work on September 24,

2021, but at some point, she received a letter from her employer, PeaceHealth Primary Clinic in

Florence, Oregon, explaining that it could not provide her with an accommodation that would

"allow [her] to continue working at this time." ECF 1 at 65. Ms. Henson explains that she has

been using her accrued paid time, which will be exhausted sometime in mid-October, at which

point she will be placed on unpaid administrative leave, subject to disciplinary action.

Plaintiff Jazmin Graff, M.D. states that she will be placed on unpaid administrative leave

on October 18, 2021, because her employer OHSU could not accommodate her even if she

received an exception. ECF 1 at 52. She explains that she then expects to be terminated from her

contract on December 2, 2021, which will preclude her from completing her residency training in

anesthesiology and critical care medicine. Because Dr. Graff will only be placed on unpaid leave

---

[34] Plaintiff Linda Riser also is an employee of St. Charles Medical Center in Bend. She states that when her exception was accepted, she was informed by St. Charles Medical Center that she could work remotely or take unpaid leave. ECF 1 at 63. Thus, it appears that remote work is an accommodation offered by St. Charles Medical Center.

before a preliminary injunction hearing could be scheduled, however, that is the relevant claimed

irreparable harm for purposes of the pending motion for TRO. Plaintiff Ms. G, like Dr. Graff,

works at OHSU and will be put on unpaid administrative leave on October 19, 2021 and

terminated on December 2, 2021.

The requirement that a plaintiff take unpaid leave, however, is an injury compensable

with money damages. It is not an *irreparable* harm that will occur if these Plaintiffs are required

to take unpaid leave. *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 300 (8th Cir. 1996)

("[The plaintiff's] loss of income from being placed on administrative leave is not irreparable

injury because she has an adequate remedy at law, namely, the damages and other relief to which

she will be entitled if she prevails in this action."). Nor do these Plaintiffs allege how taking

unpaid leave causes an irreparable harm that is imminent, or particularly how irreparable harm

will occur before the preliminary injunction hearing. For these reasons, they fail to show

irreparable injury. *Cf. Roness v. T-Mobile USA, Inc.*, 2018 WL 4335624, at *3 (W.D. Wash.

Sept. 11, 2018) (rejecting as irreparable harm the "fact that [the plaintiff] has not been earning

income while he has been on [unpaid] leave, his savings account is depleted, and Plaintiff has

been borrowing against lines of credit that may soon be exhausted").

### v.  Fines for failing to implement the Vaccine Orders

Plaintiffs Boaz Miller, Dr. C, and Dr. F. all allege that they potentially may face the risk

of a $500 per day fine because they are business owners who are required to have their

employees vaccinated. Even if the Court assumes that this possible harm is not speculative and is

sufficiently imminent, it is an economic injury and thus is not an irreparable injury because it can

be compensated with money damages. *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance*

*Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("It is true that economic injury alone does not

support a finding of irreparable harm, because such injury can be remedied by a damage award.").

### vi.  Loss of employment or business and associated benefits

Plaintiffs Candy Barnett, Christina Carmichael, Elisabeth Coates, Malcolm Johnson, Stephanie Kaiser, Kathleen Sanders, Travis Brenneman, Lean Wagerle, Wendy Sumner, Kimberly Swegar, Kelly Hickman, Jennifer Brier, Terese Lampa,[35] and Stephanie Nyhus all either assert or imply that they will lose their jobs because they refuse to get vaccinated. Some have requested and been denied an exception and some refuse to request an exception because they do not believe they should have to request an exception to decline a vaccination. Ms. Kaiser highlights that she needs the health insurance provided by her employer to pay for treatments for Ms. Kaiser's daughter's immunoglobulin therapy, which is required every three weeks and would cost $10-30,000 without insurance. Plaintiffs Terri Kam and Boaz Miller are business owners who contend that they face the loss of business because of their refusal to get vaccinated or require their employees to get vaccinated. Ms. Kam states that one of her clients, a retirement home, has stated it will not work with her business unless every employee is vaccinated. Mr. Miller states that he is concerned that he may lose his business license.[36]

---

[35] Ms. Lampa states that she had to "leave both my nursing teams" at the clinic and school where she works and that she "was taken off the schedule." ECF 1 at 87. Thus, it is unclear whether she already has lost her job, been placed on leave, or experienced some other adverse employment consequence.

[36] Plaintiff Kori Stefano is a volunteer at a school, but because there is no constitutionally protected property interest in a volunteer position, she does show irreparable harm. *See Hyland v. Wonder*, 972 F.2d 1129, 1141 (9th Cir. 1992) (concluding that the there is "no constitutionally cognizable property interest in the perpetuation of [the plaintiff's] volunteer status"); *see also Gregory v. Fresno County*, 2019 WL 2420548, at *21 (E.D. Cal. June 10, 2019), *report and recommendation adopted*, 2019 WL 7601832 (E.D. Cal. Aug. 8, 2019) (stating that "volunteering for [an] organization is insufficient to allege an interest protected by the Fourteenth Amendment"); *Johnson v. Wash. State Conservation Comm'n*, 2019 WL 1429503,

Plaintiff Melissa Swancutt was terminated on September 30, 2021 from her position as a nurse for failing to get a vaccine. ECF 1 at 71. She is concerned that the proposed new temporary rule by the Board of Nursing, which would add failure to comply with OHA COVID-19 rules to the list of behaviors and actions included under conduct derogatory to the standards of nursing, will cause her to lose her nursing license. *See* ECF 1 at 72-76 (Board of Nursing rulemaking documents). Similarly, Plaintiff Gail Giltner is a Nurse Practitioner who owns her own practice and states that she believes that the Board of Nursing is "going to try to enforce the mandate through licensure restrictions or revocations if we fail to get the vaccine." ECF 1 at 49.

These Plaintiffs face the temporary loss of their jobs and their benefits, including health insurance benefits, between now and a preliminary injunction hearing. Loss of employer-provided health insurance, however, can be replaced with private health insurance or the continuation of health insurance through the employee's group plan as established in the Consolidated Omnibus Budget Reconciliation Act (COBRA). Thus, like backpay, it is a financially compensable harm and not irreparable.

The Supreme Court has explained:

> Respondent's unverified complaint alleged that she might be deprived of her income for an indefinite period of time, that spurious and unrebutted charges against her might remain on the record, and that she would suffer the embarrassment of being wrongfully discharged in the presence of her co-workers. The Court of Appeals intimated that either loss of earnings or damage to reputation might afford a basis for a finding of irreparable injury and provide a basis for temporary injunctive relief. We disagree.
>
> Even under the traditional standards of *Virginia Petroleum Jobbers*, *supra*, it seems clear that the temporary loss of income,

---

at *6 (W.D. Wash. Mar. 29, 2019) ("There are no identifiable liberty or property interests in Plaintiffs' volunteer positions.").

ultimately to be recovered, does not usually constitute irreparable injury. In that case the court stated:

> "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray*, 415 U.S. 61, 89-90 (1974) (footnotes omitted) (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

The Supreme Court clarified:

> We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that situation rather than employed in the routine case.

*Id.* at 92 n.68.

The Ninth Circuit found such extraordinary circumstances in *Chalk v. U.S. District Court, Central District. of California*, 840 F.2d 701 (9th Cir. 1988). In *Chalk*, the plaintiff was suffering from Acquired Immune Deficiency Syndrome, and the Ninth Circuit found that his wrongful termination based on discrimination caused injury that was "emotional and psychological—and immediate." *Id.* at 710. The circumstances in that case were extraordinary, however, because of the psychological harm involved by the nature of the claims and

circumstances and because of "the very nature of Chalk's affliction. . . . Presently Chalk is fully

qualified and able to return to work; but his ability to do so will surely be affected in time. A

delay, even if only a few months, pending trial represents precious, productive time irretrievably

lost to him." *Id.*

Plaintiffs allege the temporary harm to their jobs, income, and benefits. They do not

allege discrimination, psychological or emotional harm, or other extraordinary circumstances.

Most do not allege any circumstances other than that they face the risk of losing their jobs. A few

worry about finding another job, Ms. Nyhus expresses fears about paying her bills, and Ms.

Kaiser expresses concern about paying for her daughter's expensive medical care (although she

does not discuss the availability of COBRA or private insurance). These, however, are the types

of concerns the Supreme Court states are "routine." They are compensable by money damages.[37]

---

[37] At oral argument, Plaintiff's counsel cited *Nelson v. National Aeronautics & Space Administration*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd and remanded*, 562 U.S. 134 (2011). Because of the late submission of this legal authority, Defendants were not provided the opportunity to respond. The Ninth Circuit has not specifically address what precedential value, if any, an opinion reversed on other grounds holds. In a case in which a party argued that an opinion had been "vacated on other grounds," the Ninth Circuit noted that the argument was "curious" because "[a] decision may be *reversed* on other grounds, but a decision that has been *vacated* has no precedential authority whatsoever." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) (emphasis in original). The Ninth Circuit has signified, however, that it does not consider cases that have been reversed on other grounds to be controlling precedent. *Johnson v. Gibson*, 783 F.3d 1159, 1165 (9th Cir.), *certified question accepted*, 357 Or. 326, 354 P.3d 697 (2015), *and certified question answered*, 358 Or. 624, 369 P.3d 1151 (2016) ("Another Oregon Court of Appeals decision applied *Brewer*, but was later reversed on other grounds, and thus does not constitute controlling precedent on the continuing validity of *Brewer*."). The Court determines that cases that have been reversed on other grounds may be persuasive, but are not controlling, authority.

That said, *Nelson* states: "Moreover, the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages." *Nelson*, 530 F.3d at 882. There is no further analysis or attempt to reconcile the U.S. Supreme Court's directive in *Sampson* that in the ordinary case the loss of employment is insufficient to show irreparable harm. The Court does not find the statement in *Nelson* persuasive in the context of the harm alleged in the pending motion.

*See, e.g.*, *Valdez v. Grisham*, 2021 WL 4145746, at *12 (D.N.M. Sept. 13, 2021) (concluding that "being so terminated/prevented from working as a nurse does not equate to irreparable harm" and "Plaintiffs have failed to establish that any loss to Valdez resulting from the [vaccine order] is not compensable by monetary damages"); *Norris v. Stanley*, 2021 WL 3891615, at *3 (W.D. Mich. Aug. 31, 2021) ("And if this Court determines during litigation that Plaintiff was wrongfully terminated, Plaintiff would indeed have proper monetary compensation: her lost wages and benefits she did not receive during her period of wrongful termination. These lost wages and benefits can be calculated to an exact amount and are not speculative enough to warrant a temporary restraining order. Therefore, Plaintiff has failed to show that she faces an irreparable injury in the event that MSU terminates Plaintiff's employment [because of a vaccine order]."); *see generally Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) ("[T]he loss of a job is quintessentially reparable by money damages." (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995))); *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) ("[G]iven the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury.").

## D. Balance of the Equities

In weighing the equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Plaintiffs argue summarily that "[t]he equities favor Plaintiffs," because their "fundamental constitutional rights are being trampled on in an unprecedented way." Compl. ¶ 140. Defendants respond that "[w]hatever hardship Plaintiffs might suffer from having to get vaccinated or find other employment, if they cannot qualify for

an exception, is outweighed by the benefits to the State as a whole of a vaccinated state, healthcare, and school workforce." ECF 13 at 22.

As previously discussed, the Court rejects Plaintiffs' contention that they raise a challenge implicating their fundamental constitutional rights. The Court accepts, however, that certain Plaintiffs face a difficult decision in having to take a vaccine they do not wish to take or find a new job, possibly in another state. Nonetheless, in the middle of a global pandemic while infections and hospitalizations continue at high rates, Plaintiffs are not likely to succeed in showing that their individual interests in remaining unvaccinated outweigh the State's interest in public health and welfare.[38] *See Jacobson*, 197 U.S. at 26, 28-29 (stating that it is "a fundamental principle that persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State" and that even if a state's public health measures are "distressing, inconvenient or objectionable to some," the Court will "not permit the interests of the many to be subordinated to the wishes or convenience of the few" (quotation marks omitted)).

## E.  Public Interest

When determining the public interest, a court "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quoting *Sammartano v. First Jud. Dist. Court*, 303 F.3d 959, 947 (9th Cir. 2002). Each of the three Vaccine Orders at issue identifies non-parties who may be affected by those orders. In her EO, Governor Brown describes that most patients hospitalized with COVID-19 are unvaccinated, the dramatic increase caused by the

---

[38] For Plaintiffs facing lesser degrees of harm, the balance of the equities tips even further in the State's favor.

Delta variant, and that the "surge is imperiling the state health system's ability to manage not just COVID-19 patients, but also those who require specialized medical care." ECF 3-2 at 1. The Governor emphasizes that "it is vital that as many Oregonians as possible get vaccinated, as quickly as possible." *Id.* The Education Order expresses concern that children—many of whom are not yet eligible to receive the vaccine—are required to attend school, a congregate setting where COVID-19 can be spread easily. OAR 333-019-1030(1). It also describes the purpose of the rule is "to help control COVID-19, and to protect children, teachers, school staff, volunteers, and school-based program staff and volunteers." *Id.* The Healthcare Order describes the vulnerability of patients cared for by healthcare workers, who see multiple patients over the course of a typical day and week, and that those patients are more likely than the general public to have conditions that put them at risk for complications due to COVID-19. OAR 333-019-1010(1). It explains that the "rule is necessary to help control COVID-19, protect patients, and to protect the state's healthcare workforce." *Id.*

Plaintiffs argue only that "[i]t is inherently in the public interest for individual constitutional rights to be upheld." Compl. ¶ 141. Based on the Court's finding that Plaintiffs' constitutional claims are not likely to succeed on the merits, this argument cannot overcome the significant public interest in requiring that Executive Branch employees, healthcare workers and providers, teachers, school staff, and school volunteers should be vaccinated.

As the Supreme Court explained more than one hundred years ago when the nation was attempting to eradicate the scourge of smallpox:

> The defendant insists that his liberty is invaded when the State subjects him to fine or imprisonment for neglecting or refusing to submit to vaccination; that a compulsory vaccination law is unreasonable, arbitrary and oppressive, and, therefore, hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best; and that the execution of

such a law against one who objects to vaccination, no matter for
what reason, is nothing short of an assault upon his person. But the
liberty secured by the Constitution of the United States to every
person within its jurisdiction does not import an absolute right in
each person to be, at all times and in all circumstances, wholly
freed from restraint. There are manifold restraints to which every
person is necessarily subject for the common good. On any other
basis organized society could not exist with safety to its members.
Society based on the rule that each one is a law unto himself would
soon be confronted with disorder and anarchy. Real liberty for all
could not exist under the operation of a principle which recognizes
the right of each individual person to use his own, whether in
respect of his person or his property, regardless of the injury that
may be done to others. This court has more than once recognized it
as a fundamental principle that "persons and property are subjected
to all kinds of restraints and burdens in order to secure the general
comfort, health, and prosperity of the State; of the perfect right of
the legislature to do which no question ever was, or upon
acknowledged general principles ever can be made, so far as
natural persons are concerned."

*Jacobson*, 197 U.S. at 26 (quoting *R.R. Co. v. Husen*, 95 U. S. 465 471 (1877) *Missouri, K. & T.
R. Co. v. Haber*, 169 U. S. 613, 628, 629 (1898)). This proposition was true then, and it remains
true today.

## CONCLUSION

The Court DENIES Plaintiffs' Motion for Temporary Restraining Order. ECF 6.

**IT IS SO ORDERED**.

DATED this 18th day of October, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge